The case of Johnson versus superintendents. And we'll hear from Mr. Cooley. Good morning. May it please the court. My name is Craig Cooley. I represent Arthur Johnson. And if I could request four minutes rebuttal. Granted. The issue before the court is it's a brutal issue. The district court found that Tyrone Wright's statement was inadequately redacted and introduced at Mr. Johnson's trial. The district attorney's office tried Tyrone Wright and Mr. Johnson jointly. We know very well what happened here. Yeah. Could you tell me what do we make of the limiting instruction and the jury's question to the court about the use of the statement? That's a great question. I was going to hammer that home. I think what you're referring to is the February 12, 2010 note where. They're deliberating for eight days. Yes. They come in. They give this note to the judge. The judge says, yes, you cannot use this at all. And then they go back and they come back with a guilty verdict. I think it was a cry for help. The judge told them, you can't use this statement against Arthur Johnson. During closing arguments, the prosecutor said, you got to use your common sense. And the way it was redacted. And again, I laid this out pretty comprehensively in the brief. It was obvious who the other guy was. So the jury knew that. So that as much as anything, it tells us the jury knew. The jury knew. That's what the jury was saying. Look, we get what you're saying. But you're asking us to remove from our minds something that we already know. But when they so pointedly say, and we can't use it at all, is that right? And he said, yes. Should we not credit the fact that then they didn't use it at all? I would say no. They would. That's simply. That's what Bruton said. Bruton, once you have planted that in the jury's minds. They were using it. They were like, how do we come to a determination? Well, that's not what Bruton says, right? I mean, Bruton says that we need to guard against the substantial error that could be caused by a poorly redacted statement. But I think what Judge Reddell is getting to is juries are presumed to follow the law. They're presumed to follow the instructions. So how is it that we overcome that? Bruton said there are certain exceptions where that doesn't apply. They quoted the California Supreme Court, Justice Taylor's. And I quoted that in my reply brief. In that reply brief, it's basically it's cognitive psychology. It's called observer effect. People base their decision making on what their expectation is and their expectation is formed by what they know. In this case, they knew everyone knew that Arthur Johnson was the other guy. But Bruton basically says, you know, we can ask the jury to do certain things, but that's asking too much of them. That's the way I read it. Again, they that's the reason they quote is like you're trying to extract something from somebody's mind, either consciously or unconsciously. It's like we understand we can't trick and drive, but we still do it. Part of the harmless analysis, which is different than whether there was a Bruton violation. It anticipates that a jury might be able with with a substitution of a neutral term to connect the dots. That that that in and of itself may not even be a violation. But we look at a number of factors to determine harmlessness, right? And we're talking about the limiting instruction. But what about the other the other factors? The other factors are all set forth in Van Arsdale. And it's just as a threshold question. Are those factors the Van Arsdale factors appropriate ones to consider where what we're talking about is not a partial limitation on cross-examination, but the complete absence of cross-examination? That's I would I would agree. There is I think there's a difference when again, Mr. Johnson did not get the right to confront Tyrone Wray, even though his statement was introduced and everybody on that jury, everybody in that courtroom knew the other guy with Arthur Johnson. In terms of the factors, if you look at the state's case, it came down to two people. Dionne Skipworth, the victim's brother, and Aaron Taylor. And they both presented with significant credibility issues. And this is where knowing that Arthur Johnson is the named other guy is basically enhanced the reliability. So if you're a juror, you're looking at Dionne Skipworth, you're asking, well, Dionne Skipworth testified that I immediately recognized Arthur Johnson. I knew I recognized his walk. But the murder happened on May 4th, 2008. He didn't go to the police until August 19th. But we had two eyewitnesses in Johnson v. Lamas as well, and arguably they had more significant credibility issues. Johnson acknowledged they were on high on drugs at the time, it being nighttime and and they're being at a significant distance. Here we have Dionne being close, being certain. There being no issues that are presented in the record of his perception being impaired. And if anything, his motivation, that is getting revenge for the for the against the person who had hurt his brother, which would seem to lend credence to his testimony. I would respectfully disagree. In terms of Johnson, Johnson was an advocate. And that's the big difference. And I've distinguished that in a reply brief. Johnson, the court. But a different standard. A different standard, yes. The state courts in Johnson adjudicated both the Bruton trial error claim and then they said there's no prejudice. So when the court reviewed the prejudice analysis, you had to give a preference.  So that is a much different than what we're doing here. This is DeNovo. This is Breck. This is, again, in my reply brief, we're talking about one juror. That is a difference. But it's not necessarily just positive. When we look at the how do you distinguish the evidence there that was found sufficient, granted, you know, with the deference in play versus the evidence here involving also two witnesses. But perhaps more, a confession and corroboration in terms of what Dion observed about the firearm and the ballistics evidence on the firearm. Dion Skipworth. Credibility issues are, again, he waited. If he immediately recognized him, why did he wait four months? Second, this is an eyewitness identification at night when somebody just walks up out of the blue and shoots you. So there's you could attack the identification in general. The other thing is Johnson is a heavy fellow. Correct. And there was another fellow, a skinny fellow, who was there. Dion never testified that there was anybody other than one person. Did he? No, he just yeah. He never even mentioned Abbess Parker or we got two different kinds of bullets here. I don't know if I was a juror. There's a little bit of a well, did he really see what happened? Because there were two guys. I agree. I think that's what the argument we've made is that if he honestly saw Arthur Johnson that night, he didn't tell anybody. He didn't tell Officer Lozada. Why wouldn't you tell Lozada? I wish I knew. I mean, that raises doubt. That is the credibility issues with Dion's testimony. Then Aaron Taylor, we could talk about Aaron Taylor all day. If you read that statement, they literally ended that interview with Mr. Taylor saying, oh, yeah. And my boy, Artie, confessed to shooting the guy who killed Darrell. No questions after that. Like, where did this conversation happen? When did you meet him? Why did you meet up with Artie Johnson? How long have you known Artie Johnson? Were you inside a building? It literally just, there was no questions. Was there, there was evidence wasn't there that Donnie testified against the guy who shot Darnell? Donnie, there was, it was confusing how that was played out. Donnie was implicated in Darrell Shaw's murder. That's the only testimony. That only comes through hearsay testimony through, I believe, Detective Burns. There's no real evidence that, I mean, Donnie or Dion or anybody had anything to do with Darrell. But that's the motive, that's the motive narrative that you get when you introduce Aaron Taylor's alleged statement where my client allegedly confessed. It corroborates the motive. Yeah, it corroborates the motive, yes. But Aaron Taylor at trial says, this statement is not what I said. They pick me up on a drug charge in the 15th District. Homicide detectives then take me down to Homicide. And I'm sitting there for two days. And it's the same song and dance that every, at least Philly Homicide case I have. It's trial by affidavit. You get a statement from somebody. They sign it. They want to leave Homicide. Then you get to trial. They don't testify. Then you get the detective to come up. Well, but his testimony at trial wasn't that he was coerced into the statement. It's that it never happened. It never happened. He didn't talk. It's just totally bizarre given the officer's testimony that he was there and it did happen. Yeah, he testified that this didn't happen. I never talked to, I haven't seen Mr. Johnson in years, A. Never talked to him about this murder, B. And again, this is not, this statement is false. So that testimony is in the record. You have the jury. That raises doubt. But didn't he testify that he had had a head injury and that's affected his memory? He did. But he also said, I mean, that's that wiped out in a complete aspect of this interrogation. I mean, but he remembers specifically getting picked up on that day. We said in Bond that even with a confession that was recanted, that it still had weight and significance when it came to considering harmlessness. Why should we apply that here? And I agree. That's what Bond said. Bond, but there's, one is a confession to a law enforcement. Bond, you literally have, my reading of the case is that Bond gave some sort of statement and they memorialized it and that he signed it. What we have here is literally a two-page statement from already, I mean, Aaron Taylor, where there's no questions after it. He says, this guy confessed to me. And like, okay, thank you. That's all we need. No follow-up. No, like, oh, where did this happen? Can we corroborate it? How can we corroborate what you're saying is true? And that just wasn't done. What do we do with the fact that the jury was out for so many days deliberating on Johnson? You grant my client a new trial? I think that's one of the strongest ones. The Ninth Circuit has said we consider that. I think it's a viable, they were discussing something. Not going to follow the Ninth Circuit, mind you, but. And again, there's no, I don't think there's any case law in the Third Circuit. That you guys have held explicitly, like, we can rely on jury, the length of jury deliberations. I believe all the cases I cited were from other circuits. So that's still probably an open question for this circuit. But I think it has a lot of weight. They were obviously conflicted about something. To drag out eight days from my client, you guys have to give that some value, I think, some weight. So they convicted right up front, and then Johnson was the one they were deliberating, correct? I didn't hear your first one. They had convicted, they had decided on right. Yeah, yeah, right. They got fairly, I think, within two days. And then the rest of the questions and focus was really on what to do with A, the statement, and B, the culpability, guilt, or innocence of Mr. Johnson. But I believe my time's up. And I appreciate it. Good morning, Your Honors. I'm Jennifer Andrews, former sponsor. Why don't we start where your colleague on the other side of the aisle left off? And that is, when the jury came back, and they asked twice here, day two, day four, and didn't they tell us on this record that it was their concern about Johnson and how to consider and weigh the statement of right that was holding them up beyond day four? They had already reached, they'd let the judge know they had already concluded their deliberations, right, as to right. Yes, Your Honor. I think that in this case, we do have a fairly unusual circumstance in that ordinarily, jury deliberations are a black box. We have no idea whatsoever what they're considering. Here, we know that they were asking the court expressly for guidance on whether they should block right statement from their considerations altogether. And the court told them unequivocally, yes, you must block that from your considerations. You cannot consider that as evidence against Johnson. So we know that the jury asked this question, and we know that the question was answered. I believe all of the case law implies then, given the absence of any other evidence, we are bound to presume that the jury followed the court's instruction. That's not what Bruton says. Bruton says there are certain situations where it's expecting too much of the jury. Yes, Your Honor, certainly. And here, the thing is, that question says to us, they knew that Johnson was the other guy. Once they know Johnson is the other guy, and they know that for a fact, then Bruton says you can't expect them to follow a limiting instruction. Your Honor, in this case, we also have the prosecutor's comment that you don't have to turn off your common sense, which is a point that I would like to weave in here. We know that Wright's statement says that there were two other people besides him in the car. We have Abbess Parker, we have Tyrone Wright, and we have a third individual in the car. My interpretation of what I would argue to this court is that when the prosecutor says you don't have to turn off your common sense, what she meant by that was you don't have to assume that there was some other third, completely unrelated, random individual in this car. If the common sense conclusion leads you to believe that most likely that third person, given all the other evidence in this case, if you can connect those dots, you don't have to turn that off altogether and say that there was some other third. Which she meant, but the jury conveyed to the trial judge what they understood, which was there was a conflict between that instruction and their understanding of the significance of Wright's statement. When the jury itself has communicated that and that the instruction to set that aside would require them to defy common sense, don't we know with some certainty this had a substantial and injurious effect on the jury's verdict here? No, Your Honor, I don't think it goes nearly so far as to mandate the conclusion that it caused a substantial and injurious effect. We do know that the jury had a question about that. We know how that question was answered. I would argue that that meant that the jury said, okay, so we can't consider this, let's put that aside and look at all the other evidence in isolation. But Bruton says, despite the concededly clear instructions to the jury to disregard the inadmissible evidence, in the context of a joint trial, we cannot accept limiting instructions as an adequate substitute for the petitioner's constitutional right of cross-examination. Pretty much says we can't expect them to do it. So they had that confession. The confession corroborated Taylor's statement about the motive. Absent that confession, you have really no motive. You have Taylor saying this, but it could have been just speculation. But then you have this confession talking about it. You have Dionne's testimony, which hardly asked him any questions about, you know, who else was there. And did he tell people the next day he said he did? Did they produce him? It looked to me like the scene of the crime was just not even detailed in his questioning at all. Because you've got the firehouse guys say, well, there's this skinny guy and then there's a van. And Dionne says, he walked up, I thought he was going to walk past me and he takes out a gun and shoots him. It doesn't sound like that's what happened, does it? Your Honor, I would argue that there are no really material inconsistencies. I can't speak to the prosecutor's trial strategy. My interpretation would be that she asked Dionne Skipworth very concretely about what he saw, who did the shooting, because that was the evidence that he was primarily there to provide. And he was very clear about that. At the time, Dionne and his brother were out there selling drugs, candidly. And so I don't think that it is altogether surprising that he wasn't totally scanning the area expecting Johnson. Because, again, the history of this case was that Johnson, Parker and some other individuals had had a longstanding animosity towards Dionne and his brother, Donnie, based on the prior shooting of Darnell Shaw. So that's not the evidence. Donnie was asked, I mean, Dionne was asked, you never had any problems, you and your brother, with the defendant over in the neighborhood, did you? No. Or any business, did you? No. So even though you were and you did a competition for this drug business, no, not really. Yes, Your Honor, that is his testimony. That's the testimony. When they came back after the shooting of Darnell Shaw, Dionne thought everything had cooled down. He had thought the animosity was over. He was accustomed to seeing Johnson on the street and just having these kinds of brush past interactions. But it's not Rendell's question highlights. Didn't that evidence about motive also substantially come in through Wright's statement? I think that it comes in through those two sources. Yes, it is substantially duplicative. Wright's statement is not. Well, no, it didn't come in at all for Dionne. No, no, not through Dionne. And there's a little bit that comes in from Dionne's wife. But is it, in fact, largely through the impermissible Wright's statement that the jury heard anything about motive? I think that that is one of the sources through which they heard about motive. But motive also comes in through the detective. It comes in through other witnesses as well, Your Honor. It's a... What other witnesses? I believe that, excuse me, sorry, I'm blanking for a second. Taylor spoke about it as well. Pardon? Taylor. Taylor, exactly. One witness, but then Wright's statement corroborates Taylor. Yes. So you could have had, you know, if they believe Taylor that he didn't say this... The evidence still comes in through Taylor. And it is true that Taylor was impeached, but the evidence did still come in through him. Counsel, what significance should we attach to the fact that here we have a joint trial and the jury ultimately held Wright guilty of third degree, but Johnson of first degree. How could they have reached that disparity in responsibility without having credited the statement of Wright? Well, Wright's statement can be taken as evidence against Wright. So if they are taking Wright's statement as evidence against Wright, then we have a very clear picture of he saw Johnson, although Johnson was redacted in the statement, and Abbess Parker. He drove them to this area knowing that they were going to talk to Donnie. Then he hears gunshots. Abbess Parker comes running back along a different street, I would note, than the direction that Johnson went, which I think is part of why Dion may not have seen him. I think they ran in two different directions after the shooting. But he hears the gunshot. Parker comes running back, says they shot the boy, and they drive away together. So based on those facts, it's clear that Wright was not a gunman. Wright may or may not have had a clear understanding of what they were going there to do. But certainly given everything that he knew at the time, because he was very clearly aware of the history of animosity here. And I believe he also testified that he saw the gun as, sorry, Johnson was getting into his car. So I think all of that gets you to third degree. But what he ultimately in something of an evolving statement does relate that he knew what they were going there to do. Right. Because as it's recounted in the officer's testimony, going through his statement, he initially said only that Johnson said they were going to speak with Donnie. And in his later amendment to his statement, said what they really said was that they were going to shoot him. What significance should that have? That there was this evolving nature to the statement and yet no ability to cross-examine about that evolution? Your Honor, I believe that. So we're only here as to the Bruton violation on one of the statements. His other previous statement was not subject to the Bruton challenge. As to the evolving nature of the statement, that does not surprise me. I mean, it continued to evolve even afterwards. Sorry, excuse me. I'm conflating things. Taylor is the one who disavowed his statement. Wright is not. And I apologize for that. And both the original and amendment came in through the officer's testimony. Yes. How should we not have grave doubt here? A Supreme Court said, we conclude that the uncertain judge should treat the error not as if it were harmless, but as if it affected the verdict. If we have grave doubt, we mean that in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness. Your Honor, if you do in fact have those grave doubts, then I believe that binds. But I don't think that the evidence in this case rises to that level. Here, and I know that Your Honor's asked previously whether the Van Aerstel factors should be considered. Although this is not precisely in line with that, I do believe that that framework does offer valuable guidance because there is no separate test to the best of my knowledge. And I believe that if you run through those factors, it becomes clear that Wright's statement was cumulative, corroborative, but not uniquely or independently incriminating as to any specific element of the crime. But wasn't it corroborative in a bad way? As we've already talked about the motive aspect. The motive is important, but one, it was not unique to the statement, and two, it doesn't actually go to the crime itself. A history of animosity is relevant, but it's not dispositive as to whether or not Johnson pulled the trigger, which all comes in through Dion Skipworth. But through Dion, absolutely no motive came forth at all. But motive isn't a required element. We don't, I mean, he could have, he could have just seen it happen and not have known anything at all about what happened. He may not have, even if it wasn't his brother, even if he had been a stranger on the scene and he had seen this happen, it would still establish every element of first-degree murder. Well, motive may not be important, but you wonder why, gratuitously, Johnson would take out a gun and shoot Donnie. Well, certainly, yes, you might wonder that. But in this case, again, we do have evidence of motive coming in through other witnesses, and we do also not need that to establish first-degree murder. You have to rely heavily on Dion's statement to argue that Wright's statement was merely corroborative. But one of the Van Arsdale factors is the extent to which there are inconsistencies in the statement with other evidence. And here, as to Dion's statement, don't we have two? Him originally telling the officer on the scene that he hadn't seen anything, and secondly, failing to report that there was a second shooter. Yes, Your Honor. As to the first one... Can I give a pause about what weight we can give to Dion's statements and, in turn, just how important Wright's was in the conviction here? I would argue not under the particular circumstances of this case. Dion was very candid about saying that he was hoping to kill Johnson himself. He wanted to find him on the street and kill him himself. He only came forward to police once Johnson had been taken into custody on an unrelated matter, and it was no longer feasible for him to kill him on the street. But that was inconsistent with his testimony at the preliminary hearing, where he said he didn't have the guts, he had to, you know, figure out what to do, and he was afraid. That concept of, oh, I was going to kill him myself, the first time he mentioned that was at trial. I don't think those two things are mutually incompatible. One, because Dion Skipworth is someone who has lived in these neighborhoods all his life. You don't think that if originally he thought, I'm going to get him myself, he wouldn't have said that at the preliminary hearing, that that's why, if that was the reason he didn't come forward? I believe that both of those reasons were true. I believe, because he says, you know, in the culture where I come from, snitches get stitches, you don't cooperate with the police. And I believe that he was afraid, one, of reprisal and blowback for himself and his family and his friends on the street. And two, he was, in fact, hoping to kill Johnson. If you're going to have both of these reasons in your heart at the same time, one of them is much more sympathetic than the other. And you might lead with the one that says, I was afraid, I was worried because this is true, and not, I was hoping to murder him myself, which is also true, but less sympathetic. He also was inconsistent in whether he told anybody. Originally he said he didn't tell anybody, and then at trial he says he told his cousins. And he also said he didn't, he never knew Burns before, but he clearly met Burns in connection with another case, hadn't he? I don't recall specifically whether he had met Detective Burns. Yeah. I would say that it's been consistent that he did not come forward to police. So again, it's not surprising to me, at least, that he did not disclose the shooter's identity to Officer Lozada right there on the scene with everyone still around, and him still having these ulterior motives in the back of his head. Well, can you address the significance of the standard here? I mean, is it really coincidence that in Washington, Adamson and Vasquez, in concluding that there was not harmlessness, or that there was actual prejudice, we were playing Brecht and not at predeference? That is true. And this is a case in which Brecht is the appropriate standard to use. However, in all of those cases, I would note that the only evidence provided in those cases was either or, I mean, and or, the defendant's own confession, which in most cases was undercut, and the testimony of other co-defendants who had a very clear and substantial motive to shove off responsibility onto the defendant who was ultimately convicted. Here, we don't have that. We do have Skipworth and Taylor and other witnesses, including the firemen, who corroborate their statements, who have no reason to do that. They are not trying to push their own guilt off onto someone else. Quick question on the standard, which I'd like to hear about from Mr. Cooley as well. He's argued that as we go about formulating the Brecht test, that it is the same as Strickland prejudice, and that the ways that those are articulated are really one and the same. Does the government agree with that? Are they interchangeable in how we formulate the test? Your Honor, I candidly could not speak to that because I was not entirely able to follow that argument myself. Strickland seems to me very different in that it is a two-pronged test. Here, Brecht seems very clear. It's substantial and injurious, and a showing of actual prejudice. So to the extent that actual prejudice means the same thing as substantial and injurious harm, I think that's already said in Brecht itself, so I don't know how bringing Strickland into it clarifies anything. Then where does grave doubt come in? I think they're all trying to articulate... I mean, that's different from Strickland, is it not? I think that they're all trying to articulate the same thing. If there are nuances to be parsed between the standards, they are quite beyond my ability to discern. I think in all cases, did this really matter? Was this really important to such a degree that it undermines confidence in the fairness of the product? I think you're in good company, as Justice Scalia seemed to have the same concerns as concurrence in Dominguez-Benitez. Any other questions? Thank you, Your Honor. Thank you, counsel. Just to follow up on the Court's question regarding the standard, in three cases, this Court has said, quote, that Strickland and Brecht are, quote, essentially the same. It started in Whitney v. Horn in 2002. That was in a footnote, and then in Brecht in 2007, they say, they paraphrase, they say, quote, Strickland, Presidents, and Brecht, harmless error, are essentially the same standard. There's a reason to talk about that in ineffective assistance cases. Is there a reason that you need, or we need to rely on that here? Yeah. For this reason, when you hear substantial and injurious, that conceptually, you visualize, wow, that is a insurmountable hurdle. But when you view it through a Strickland lens, you're like, okay, and this is why I cited Buck v. Davis. I think Justice Alito does a great job framing the issue. If Brecht and Strickland are the same, the issue here is, is it reasonably probable that without Tyrone Wright's inadequately redacted statement, at least one juror would have had reasonable doubt as to whether Mr. Johnson murdered Donnie Skipworth. When you view it that way, when I did the more research and I saw that they were the same, that this court has held they were the same, I was like, all right, that standard, I think when you argue it, it's much more palatable, at least for a defense attorney, to argue, to come in and say, look, one juror would have reasonable doubt. And that's what, it's said it over and over again. Then there's a case that's not reported, Rainey, which is 658 FedEx 142, same thing. He has quotes, brick iron, that says Brecht and Strickland are essentially the same standard. But I'm surprised that you wouldn't say that the Brecht standard is even more favorable to you. Because we've said in Washington, but if we have grave doubt about whether the error had substantial injurious effect or influence in determining the verdict, we must conclude that the error was not harmless. Yeah, I agree. Both of them, when you focus on the grave doubt, yes, that's favorable. But I believe Strickland is even more favorable because in this case, you're literally looking for one juror. And again, if you think about it, conceptualize, try to visualize the DA's case in a properly redacted statement. If they jointly try Tyrone Wright and Arthur Johnson, how does that narrative go? You have, if you introduce that statement under gray, you can't even mention that there is a third person. So you literally have Tyrone Wright's statement, basically, me and Alvis Parker were in a car and then what happened? You can't say what happened because it implicates a third non-confessing co-defendant. Hasn't the Supreme Court cautioned us against taking the breath test as one that is forward-looking, that we're looking at hypotheticals of what might have happened? The focus, including the court refocusing us in Davis versus Ayala, is to look back to what actually did happen and actual prejudice. So in that sense, is that, are they really one and the same, at least the way you're articulating prejudice for Strickland purposes? If you view it for the Strickland, one, if it's reasonably probable without this statement, yeah, you can look at it that way. But even in both standards, I believe he's established prejudice. And again, what Tyrone Wright's statement did, it's what you guys talked about in Washington, the corroborative effort of Waddy's statement. And then Waddy, Johnson, and Mr. Washington all tried. Taylor testified, implicated Washington as the driver, and Waddy gave a statement. Waddy said that Washington was the driver, but Waddy didn't testify. In that case, you looked at the corroborative effect of Waddy's statement. And that's what happened here. Tyrone Wright's statement gave the jury the ability to say, okay, we know it's Tyrone. We know the other guy is Arthur Johnson. We know Dion has credibility issues. And we know Taylor has credibility issues. But here's this co-defendant giving this statement. And that's where I think the prejudice is. And that's why I cited that pretty extensively in the reply brief. Thank you, Mr. Foley. Thanks to both counsels for very helpful arguments and briefing. And we'll take the case under submission.